# Supreme Court of Florida

_____

No. SC15-1988
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**JON DOUGLAS PARRISH,**
Respondent.

[May 3, 2018]

PER CURIAM.

We have for review a referee's report recommending that Respondent, Jon Douglas Parrish, be found guilty of professional misconduct in violation of the Rules Regulating the Florida Bar (Bar Rules) and suspended from the practice of law for a period of one year.[1] Parrish seeks review of the referee's report, challenging the referee's recommendations of guilt and recommended discipline. Subsequent to the filing of the referee's report, the Court issued an order directing Parrish to show cause why the referee's recommended discipline should not be

---

1. We have jurisdiction. _See_ art. V, § 15, Fla. Const.

disapproved and a more severe sanction imposed. Upon review of the report of referee, the parties' briefs, and the response to the order to show cause and the Bar's reply, we approve the referee's findings of fact and recommendations as to guilt. However, as discussed below, we disapprove the referee's recommended discipline and instead suspend Parrish from the practice of law for three years.

**FACTS**

On October 29, 2015, The Florida Bar filed a formal complaint against Respondent Parrish, alleging various instances of ethical misconduct in connection with his representation of a client, Spruce River Ventures, LLC, and its principal, Benjamin Bergaoui, in three separate legal matters.

Count I of the Bar's complaint was based on an agreement between Parrish and Bergaoui to use Bergaoui's Lamborghini to pay Parrish's legal fees. The referee found that the agreement was in writing and conferred a security interest in the Lamborghini in favor of Parrish's firm in the amount of $30,000. Bergaoui was given ninety days to sell the vehicle for at least $30,000, with $30,000 to be paid to the firm for legal fees. If Bergaoui failed to sell the vehicle within ninety days, the firm would then have the right to market and sell the vehicle and give Bergaoui a credit for current and future legal fees in the amount of the sale or in the amount of $80,000, at the firm's discretion. The referee found that although Bergaoui had given his Lamborghini as security to others in the past, that did not

- 2 -

exempt Parrish from compliance with the clear requirements of Bar Rule 4-1.8(a) (Conflict of Interest; Prohibited and Other Transactions; Business Transactions With or Acquiring Interest Adverse to Client).[2] Based on the above findings of fact, the referee recommended that Parrish be found guilty of violating Bar Rules 3-4.3 (Misconduct and Minor Misconduct), 4-1.5(a) (Illegal, Prohibited, or Clearly Excessive Fees and Costs), and 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client).

Count II of the Bar's complaint was based on Parrish's handling of litigation against Spruce River and Bergaoui related to an agreement to supply urea. The complaint alleged that Parrish failed to act diligently in defending the case and keeping Bergaoui informed and that he intentionally used an incorrect address to notify Bergaoui of his motion to withdraw, preventing Bergaoui from being aware of the withdrawal, resulting in default. At the close of the Bar's case-in-chief, the referee granted Parrish's motion for involuntary dismissal. Accordingly, as to this count, the referee recommended that Parrish not be found guilty of any rule violations. The Bar does not challenge these findings or recommendation.

Count III of the complaint pertained to Parrish's representation of Spruce River in litigation against several defendants seeking specific performance of a

_____

2. Rule 4-1.8(a) governs business transactions with clients.

contract to purchase seven parcels of real property in Charlotte County, Florida, for development and also seeking monetary damages in connection with the alleged breach of that contract (*Spruce River Ventures v. Cotton*, No. 082004CA001715XXXXXX (Fla. 20th Cir. Ct.) – the Cotton case). The complaint alleged several areas of misconduct: (1) failing to respond to a death notice filed in the case and lack of communication; (2) loaning money to several of the defendants in order to fund payment of back property taxes and accepting mortgages on several of the parcels involved in the case to secure that loan; (3) negotiating a potential settlement agreement which created a new entity in which Parrish would be a part owner; and (4) communicating directly with several defendants at a time when they were represented. Summary judgment was granted in Parrish's favor with regard to the allegations of direct communication. In addition, after the close of the Bar's case-in-chief, the referee granted Parrish's motion for involuntary dismissal with regard to the allegations of lack of communication with the client in violation of Bar Rule 4-1.4 (Communication).

As for the remaining allegations, the referee found that on April 8, 2011, one of the defendants in the Cotton case wrote to the trial court and advised that another of the defendants, Louise McKamey, had died. The letter was copied to the attorneys of record, including Parrish, who testified that his firm received the letter. No action was taken by Parrish or anyone in his firm to substitute a new

party in place of McKamey. Over a year later, on May 24, 2012, another defendant filed a motion to dismiss the complaint, with prejudice, as a result of Spruce River's failure to substitute a new party within ninety days, as required by Florida Rule of Civil Procedure 1.260(a). On February 27, 2013, the court granted the motion to dismiss. Parrish filed a motion to substitute parties related to three deceased defendants, including McKamey, over a year after the notice of McKamey's death, but the court denied the effort as untimely. This issue was appealed by subsequent counsel in the case, but was never decided by the appellate court because the case settled.

Parrish testified before the referee that the defendants were elderly and the death of individual defendants was an ongoing concern. In addition, the defendants argued that the real estate contract was not severable, so diligence in substituting new defendants for deceased defendants was imperative because dismissal of one could result in dismissal of the entire action. Parrish testified that although his firm received the letter he did not personally see it, and he contended that because an associate had been assigned to the case, he was not responsible to respond. When he learned of the letter, he did attempt to substitute parties but well after the deadline. The referee concluded that Parrish's attempts to blame others for his failure to respond were not persuasive, because Bergaoui believed Parrish was his attorney and the retainer agreement stated that Parrish would be "primarily

- 5 -

responsible" for the representation. Thus, the referee found that Parrish's failure to act in response to the death notice was an unreasonable failure to act diligently and competently.

With regard to the loan and mortgage transaction, the referee found Parrish loaned $150,000 to several defendants in the Cotton case, took a mortgage on the parcels owned by those defendants, and had Bergaoui sign a subordination agreement, subordinating Bergaoui's interest in the property—which was being pursued in the Cotton case—to the mortgage. The defendants in question had failed to pay real estate taxes on the properties for several years and were financially unable to do so. The parcels constituted over fifty percent of the property at issue in the case, and Parrish testified that the loss of those parcels would result in the dismissal of the case because of the severability issue. Parrish made the loan in order to preserve his client's claim and protect his interest in his fee, which was now a contingency fee. Parrish requested that another attorney, John White, prepare the documentation for the loan transaction. White had previously been a law partner with Parrish and is currently a partner of Parrish, but was not at the time of the mortgage transaction. White prepared the note, mortgage, and subordination agreement, and also met with Bergaoui regarding the subordination agreement.

The referee found that no written disclosures were made outside of the loan documents and specifically no written notice was given to Bergaoui to seek independent legal advice and no written disclosure was made of Parrish's role in the transaction and whether he was representing Spruce River in the transaction. The referee found that White did not act as independent legal counsel advising Bergaoui. Parrish initially consulted with White about the tax deeds and their effect. White prepared the note and mortgage for Parrish and took his instructions for the preparation of those documents from Parrish. Parrish testified that he chose White and required Bergaoui to meet with White. Although White claimed he considered himself to be representing Bergaoui and Spruce River, Bergaoui testified that he did not consider White to be representing him or Spruce River. After the mortgage transaction was completed, another defendant moved to disqualify Parrish, in response to which Parrish prepared an affidavit to be signed by Bergaoui stating that Bergaoui had declined the opportunity to seek independent legal counsel. Only after Bergaoui refused did Parrish begin claiming that White had been independent legal counsel for Spruce River. Because of this, the referee found that Parrish's and White's testimony regarding White having been independent counsel was not credible, and was instead a post hoc effort to recast events in a manner more consistent with ethical requirements. The referee also found that by making the loan to the defendants, Parrish expended funds on

something other than litigation expenses, in order to benefit his client, which constituted financial assistance to the client. Further, the referee found that the mortgage transaction constituted the acquisition of a proprietary interest in the subject matter of the litigation.

With regard to the proposed settlement agreement in the Cotton case, the referee found that although never fully executed, the agreement provided for the creation of a new Florida limited liability company to be owned by Parrish's firm, Bergaoui, and several of the defendants in the Cotton case. Parrish would also be a manager of the new entity. The entity would substitute into the litigation for its various participants and seek to obtain the entire tract for development. Witness David Alston, Jr., a family representative of several of the defendants in the Cotton case, testified that following a mediation conference, the framework of the settlement was established whereby the parties would seek to join forces to sell or develop the property. Alston testified that this format was the only feasible approach to settling the case and Parrish's inclusion in the deal was a requirement for the defendants to agree, because his family members had little faith in Bergaoui and did not want to be involved in a transaction with him unless Parrish was also involved. The referee found that under the terms of the agreement, Parrish would have co-equal decision-making authority with his client in directing litigation strategy and an ownership interest in the subject matter of the litigation, and that

such an arrangement constituted a business transaction with the client. However, no written disclosures as required by Bar Rule 4-1.8(a) were made regarding the settlement. The referee found Parrish's testimony that he intended to advise Bergaoui to seek independent counsel prior to executing the agreement was not credible based on Parrish's prior failure to comply with Bar Rule 4-1.8(a) with regard to the Lamborghini agreement and the subordination agreement.

After the motion to disqualify Parrish was filed, and Bergaoui refused to sign the affidavit prepared by Parrish, Bergaoui sought independent legal counsel from attorney Brad Bryant. Bryant advised Parrish that Bergaoui did not want Parrish to be a partner in any business venture. The relationship between Bergaoui and Parrish broke down, and Parrish withdrew from the Cotton case in February 2013.

In regard to Count III, based on the above factual findings, the referee recommends that Parrish be found guilty of violating Bar Rules 3-4.3 (Misconduct and Minor Misconduct), 4-1.1 (Competence), 4-1.2 (Objectives and Scope of Representation), 4-1.3 (Diligence), 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client), 4-1.8(e) (Financial Assistance to Client), and 4-1.8(i) (Acquiring Proprietary Interest in Cause of Action). The referee also recommends that Parrish not be found guilty of violating Bar Rules 4-1.4

(Communication) and 4-4.2 (Communication with Person Represented by Counsel).

The referee recommends that Parrish receive a one-year suspension. In making this recommendation, the referee found and considered the following aggravating factors: (1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) refusal to recognize wrongful nature of the misconduct; and (5) substantial experience in the practice of law. The referee found and considered one mitigating factor—absence of a prior disciplinary record.

## ANALYSIS

Parrish challenges the referee's recommendation that he be found guilty of violating Bar Rules 3-4.3, 4-1.5(a), and 4-1.8(a) in connection with Count I, the Lamborghini agreement. In addition, Parrish challenges the recommendation that he be found guilty of violating Bar Rules 3-4.3, 4-1.1, 4-1.2, 4-1.3, 4-1.8(a), 4-1.8(e), and 4-1.8(i) with regard to Count III, the Cotton case. Lastly, Parrish argues that the referee's recommendation of a one-year suspension is unsupported by the Standards for Imposing Lawyer Sanctions (Standards) and the cited case law; nor does Parrish believe that a more severe sanction is necessary.

*RULE VIOLATIONS*

To the extent Parrish challenges the referee's findings of fact for the rule violations, the Court's review of such matters is limited, and if a referee's findings

of fact are supported by competent, substantial evidence in the record, this Court will not reweigh the evidence and substitute its judgment for that of the referee. *Fla. Bar v. Frederick*, 756 So. 2d 79, 86 (Fla. 2000). Moreover, a referee's recommendation as to guilt will be approved by the Court if the referee's factual findings are sufficient under the applicable rules to support the recommendation. *Fla. Bar v. Shoureas*, 913 So. 2d 554, 557-58 (Fla. 2005). Finally, the party challenging the referee's findings of fact and conclusions as to guilt has the burden to demonstrate that there is no evidence in the record to support those findings or that the record evidence clearly contradicts the conclusions. *Fla. Bar v. Germain*, 957 So. 2d 613, 620 (Fla. 2007).

## Count I – The Lamborghini Agreement

With regard to the Lamborghini agreement, the referee found that the agreement was in writing and conferred a security interest in the Lamborghini in favor of Parrish's firm in the amount of $30,000. Bergaoui was given ninety days to sell the vehicle for at least $30,000, with $30,000 to be paid to the firm for legal fees. If Bergaoui failed the sell the vehicle within ninety days, the firm would then have the right to market and sell the vehicle and give Bergaoui a credit for current and future legal fees in the amount of the sale or in the amount of $80,000, at the firm's discretion. The agreement, entered into evidence before the referee, required Bergaoui to "execute and sign over to PWL [Parrish's firm] title, in

blank," to the car "to hold as security against the payment of fees." It further required Bergaoui to, within ninety days, "procure a purchaser for the vehicle for not less than $30,000." Upon procurement of a purchaser, the agreement provided that the "parties will cooperate to close upon the vehicle" and payment "shall be made to PWL to be held in escrow." Upon receipt of payment, PWL agreed to "release the title to the purchaser," then "disburse $30,000 to itself for payment of past and on-going legal fees and shall release any remainder to Bergaoui." If the vehicle was not sold in the ninety days, Bergaoui was required to "deliver the car to PWL" who then had the "right to market and sell the vehicle and apply the funds to Bergaoui's then legal fees or to future legal fees or to credit Bergaoui's account in the sum of $80,000, at its discretion and sole option."

*Bar Rule 3-4.3 (Misconduct and Minor Misconduct)*

Bar Rule 3-4.3[3] states as follows:

> The standards of professional conduct required of members of the bar are not limited to the observance of rules and avoidance of prohibited acts, and the enumeration of certain categories of misconduct as constituting grounds for discipline are not all-inclusive, nor is the failure to specify any particular act of misconduct to be construed as tolerance of the act of misconduct. The commission by a lawyer of any act that is unlawful or contrary to honesty and justice may constitute a cause for discipline whether the act is committed in the course of the lawyer's relations as lawyer or otherwise, whether

---

3. Bar Rule 3-4.3, as quoted, is that which became effective February 1, 2018, which only included technical changes. *See In re Amends. to Rules Regulating Fla. Bar*, 234 So. 3d 632 (Fla. 2017).

- 12 -

committed within Florida or outside the state of Florida, and whether the act is a felony or a misdemeanor.

The purpose of this rule is to express that "the enumerated categories of misconduct—specifically the Rules of Professional Conduct contained in Chapter 4 of the Rules Regulating the Florida Bar—are not intended to be an exhaustive list of unethical conduct that may provide grounds for imposing discipline." *Fla. Bar v. Draughon*, 94 So. 3d 566, 570 (Fla. 2012). The rule can form an independent basis for discipline. *Id.* Here, the referee's factual findings support the conclusion that Parrish improperly entered into a business transaction with his client in violation of the rules of professional conduct—contrary to honesty and justice.

*Bar Rule 4-1.5(a) (Illegal, Prohibited, or Clearly Excessive Fees and Costs)*

Bar Rule 4-1.5(a) states, in pertinent part, that an attorney "shall not enter into an agreement for, charge, or collect an illegal, prohibited, or clearly excessive fee or cost." Although the referee's report does not contain any specific factual findings as to whether the Lamborghini agreement was an agreement for an illegal, prohibited, or clearly excessive fee, the Lamborghini agreement violated Bar Rule 4-1.8(a), as discussed below, and therefore provided for a "prohibited fee" because the agreement itself violated the rule.

*Bar Rule 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client)*

Rule 4-1.8(a) governs business transactions with clients. The rule prohibits business transactions with clients, unless (1) the terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client; (2) the client is advised in writing of the desirability of and is given a reasonable opportunity to seek independent legal counsel on the transaction; and (3) the client gives informed consent in writing. The comment to the rule also explains that the rule "does not apply to ordinary fee arrangements between client and lawyer, which are governed by rule 4-1.5, although its requirements must be met when the lawyer accepts an interest in the client's business or other nonmonetary property as payment for all or part of a fee." Here, the Lamborghini agreement clearly pertained to legal fees, in that it was designed to ensure payment of such fees. This was not an "ordinary fee arrangement." The referee specifically found that the "forced sale" provision— i.e., the provision giving Parrish's firm the right to sell the car and apply the proceeds of the sale to Bergaoui's legal fees—triggered the requirements of the rule, which were not satisfied. Saliently, the agreement unfairly afforded Parrish's firm the potential to obtain funds from the sale of the client's Lamborghini in an indeterminate amount that would constitute an excessive fee.

Based upon the foregoing, we approve the referee's recommendation that Parrish be found guilty of violating Bar Rules 3-4.3, 4-1.5(a), and 4-1.8(a).

**Count III – Representation of Spruce River in the Cotton case**

The referee recommends that Parrish be found guilty of numerous Bar Rule violations under Count III, which pertains to several areas of misconduct with regard to Parrish's representation of Spruce River in *Spruce River Ventures v. Cotton*, No. 082004CA001715XXXXXX (Fla. 20th Cir. Ct.), the Cotton case. The misconduct includes failing to respond to a death notice filed in the case, loaning money to several of the defendants in order to fund the payment of back taxes, accepting a mortgage on several parcels to secure the loan, and negotiating a potential settlement agreement which created a new entity in which Parrish would be a part owner. We address each of the Bar Rule violations in turn.

*Bar Rule 3-4.3 (Misconduct and Minor Misconduct)*

As previously discussed, Bar Rule 3-4.3 can form an independent basis for discipline and its intent is to express that the Rules of Professional Conduct contained in Chapter 4 of the Bar Rules are not an exhaustive list of unethical conduct. *Draughon*, 94 So. 3d at 570. Rather, any act by an attorney that is unlawful or contrary to honesty and justice may provide a basis for discipline. Here, the referee's findings pertaining to the proposed settlement agreement support the conclusion that had it been executed, it would have been clearly in violation of Bar Rules 4-1.8(a) and (i). The proposed agreement would have constituted a business transaction with the client and would have given Parrish a

proprietary interest in the subject matter of the litigation in that his firm was to be part owner of the new limited liability company that was to substitute into the litigation.

*Bar Rule 4-1.1 (Competence) and Bar Rule 4-1.3 (Diligence)*

Parrish challenges the referee's recommended finding of guilt of violating Bar Rules 4-1.1 and 4-1.3 with regard to the handling of the letter sent by one of the defendants in the Cotton case informing the court that one of the other defendants, Louise McKamey, had died. The referee made the following findings of fact on this issue:

> The facts related to the death notice are fairly straight-forward. On April 8, 2011, one of the defendants wrote to the court handling the Cotton case and advised that another of the defendants, Louise Mckamey [sic], had passed away the previous day. The letter was copied to the attorneys of record in the Cotton case, including Respondent. Respondent testified that his firm received the notice. No action was taken by Respondent or anyone in his firm to substitute a new party in place of Mckamey [sic]. Over a year later, on May 24, 2012, another defendant filed a motion to dismiss the pending complaint, with prejudice, as a result of Spruce River's failure to substitute a new party within 90 days, as required by Fla. R. Civ. P. 1.260(a). On February 27, 2013, the court granted the motion to dismiss.
> In response to the May 2012 motions, Respondent filed a Motion to Substitute Parties related to three deceased defendants, including Mckamey [sic]. This action was taken over a year after the notice of Mckamey's [sic] death, and the court denied the effort as untimely. Respondent testified that the issue was appealed by subsequent counsel, but never decided by the appellate court because the case settled.
> Respondent testified that the defendants were elderly and the death of individual defendants was an ongoing concern. Respondent

- 16 -

also testified that the defendants were arguing that the real estate contract was not severable, so the loss of a single defendant would result in the dismissal of the entire claim. Accordingly, diligence in substituting new defendants for deceased defendants was imperative, because dismissal of even a single defendant could result in the entire action being dismissed. Respondent also testified that, although his firm received the April 8 letter, he did not personally see it. He also testified that the case had been assigned to an associate, so Respondent was not responsible to respond to the letter. When he did personally learn of the letter, Respondent did attempt to substitute parties, though well after the deadline established by rule.

Respondent's attempts to blame others for his failure to respond are not persuasive. Bergaoui testified that he considered Respondent to be his attorney. Respondent's initial retainer letter stated that Respondent would be "primarily responsible" for the representation. Having accepted primary responsibility for the representation, Respondent is responsible for the action or inaction of those he utilized to assist him. Respondent can cast aspersions on associates or staff members, but he cannot escape the responsibility he accepted. Given the importance of the issue, of which Respondent testified that he was well aware, Respondent's failure to act in response to the death notice was an unreasonable failure to act diligently and competently.

Report of Referee at 7-8 (record citations omitted).

Bar Rule 4-1.1 states that a lawyer must provide competent representation and that such requires "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." The comment to this rule also explains that competence includes

inquiry into and analysis of the factual and legal elements of the problem and use of methods and procedures meeting the standards of competent practitioners. . . . The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence.

- 17 -

R. Regulating Fla. Bar 4-1.1 cmt. Bar Rule 4-1.3 requires lawyers to "act with reasonable diligence and promptness."

Parrish contends that he should not be found guilty of violating Bar Rules 4-1.1 and 4-1.3 because he had assigned the responsibility of handling issues surrounding the death of defendants to an associate, and he did not personally receive the letter in question, but when he did, he took immediate action. Parrish relies upon Bar Rule 4-5.1 (Responsibilities of Partners, Managers, and Supervisory Lawyers), which states that a supervisory lawyer is responsible for a supervised lawyer's misconduct only if the supervisory lawyer knows of the conduct at a time when its consequences may be avoided or mitigated but fails to take reasonable remedial action. However, Parrish was not charged with or found guilty of violating rule 4-5.1. Also, he overlooks Bar Rule 4-5.1(b), which requires a supervisory lawyer to "make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." Therefore, Parrish, as the primary lawyer, cannot simply disclaim responsibility for attending to what all agreed was an important issue in the case. As the primary lawyer, he was obligated to provide competent and diligent representation, which in this case clearly included giving appropriate attention to and exercising reasonable diligence with regard to an important and ongoing legal issue in the case. The factual findings of the referee support a conclusion that Parrish did not meet these obligations.

*Bar Rule 4-1.2 (Objectives and Scope of Representation)*

Parrish challenges the referee's recommendation of guilt for violating Bar

Rule 4-1.2 pertaining to the proposed settlement agreement in the Cotton case.

The referee made the following findings of fact on this issue:

> Although never fully executed, the settlement agreement was partially executed and provided for the creation of a new Florida limited liability company to be owned by Respondent's firm, Bergaoui, and several of the defendants in the Cotton case. Respondent would also be a manager of the new entity. The new entity would substitute into the litigation for its various participants and seek to obtain the entire tract for development. Witness David Alston, Jr., testified that, following a mediation conference in 2011, the framework of settlement was established whereby the parties would seek to join forces to sell and/or develop the property. Alston testified that this format was the only feasible approach to settling the case and that Respondent's inclusion in the deal was a requirement for the defendants to agree. He testified that his family members had little faith in Bergaoui and did not want to be involved in a transaction with him unless Respondent was also involved. He frequently referred to Respondent and Bergaoui as "partners." On August 10, 2012, one of the other defendants learned of the potential settlement agreement and filed a motion to disqualify Respondent. In response, Respondent sought to have Bergaoui sign the affidavit claiming that he had declined the opportunity to seek independent counsel. Bergaoui then sought out independent legal counsel from Brad Bryant. Bryant advised Respondent that Bergaoui did not want Respondent to be a partner in any business venture. The relationship between Respondent and Bergaoui broke down, and Respondent withdrew from the Cotton case in February 2013. . . .
>
> Although not fully executed, the settlement agreement was partially executed and the framework of the agreement was the same as it had been for the prior year. Furthermore, this framework, in which Respondent would be a participant in a new business venture, was a requirement of the defendants for any settlement. The terms of the settlement agreement gave Respondent co-equal decision-making with his client in directing litigation strategy, gave Respondent an

- 19 -

ownership interest in the subject matter of litigation, constituted a business transaction with a client. [sic] No written disclosures as required by Rule 4-1.8(a) were made regarding the settlement.

Respondent testified that he intended to advise Bergaoui to seek independent counsel prior to executing the agreement. This testimony was not credible based on Respondent's prior failure to comply with Rule 4-1.8(a) in the Lamborghini agreement and the subordination agreement. Respondent's reaction to Bryant's involvement as independent counsel also demonstrates the falsity of Respondent's claim. Furthermore, meeting the requirements of Rule 4-1.8(a) would not permit the violations of Rule 4-1.2 and Rule 4-1.8(i) contained in the settlement agreement. No provision allows for the waiver of those violations.

Report of Referee at 12-14.

We agree with the Bar that the referee's recommendation is supported by his findings that the proposed settlement agreement would have given Parrish co-equal decision-making authority with his client in directing litigation strategy, in violation of Bar Rule 4-1.2(a) (Objectives and Scope of Representation; Lawyer to Abide by Client's Decisions). This subdivision requires lawyers to abide by a client's decisions concerning the objectives of representation and consult with the client as to the means by which those objectives are to be pursued.

*Bar Rule 4-1.8(a) (Business Transactions With or Acquiring Interest Adverse to Client)*

Parrish argues that the Court should disapprove the referee's recommendation that he be found guilty of violating Bar Rule 4-1.8(a) in connection with the subordination agreement he entered into with his client. On this issue, the referee made the following findings of fact:

- 20 -

In order to preserve his client's claim and to protect his interest in his fee, which was now a contingency, Respondent agreed to loan $150,000 to the Shepards and the Alstons for payment of the back taxes. Respondent also insisted that Spruce River subordinate its interest being pursued in the Cotton case to Respondent's mortgage interest. Respondent requested that another Naples attorney, John White, prepare the documentation for the loan transaction. John White had previously been law partners with Respondent and is currently law partners with Respondent, but was not affiliated with Respondent at the time of the mortgage loan transaction. John White prepared the note, mortgage, and subordination agreement, and also met with Bergaoui regarding the subordination agreement. The documents were executed, and the mortgage and subordination agreement were recorded in the public records. No written disclosures were made outside of the loan documents. Specifically, no written notice was given to Bergaoui to seek independent legal advice and no written disclosure was made of Respondent's role in the transaction and whether he was representing Spruce River in the transaction. Currently, the note and mortgage have been assigned by Respondent to SWFLA Holdings, LLC, an entity created by Respondent, which is seeking to foreclose the mortgage against Spruce River and the Shepards and Alstons and also seeking monetary damages against the Shepards and Alstons. Although there was some dispute regarding the length of the discussions between White and Bergaoui, all of the foregoing facts were basically agreed by all relevant witnesses: Bergaoui, Respondent, David Alston, Jr., John White, and Ann White.

Respondent contends that written advice to seek independent counsel was unnecessary because Bergaoui actually obtained independent legal advice from John White. I find that, regardless of the length of their discussion, John White was not independent legal counsel. Respondent and John White both testified that, when he first learned about the tax deeds, Respondent initially consulted with White regarding the effect of the tax deeds. White prepared the note and mortgage for Respondent. White took his instructions for the preparation of the documents from Respondent. Respondent testified that he chose White and required Bergaoui to go see White. White also knew little about the Cotton case and testified that he mostly talked to Bergaoui about the specific information needed to prepare the documents (names, property descriptions, etc.) and about the

potential impact of tax deeds. Furthermore, although White claimed he considered himself to be representing Bergaoui/Spruce River, Bergaoui testified that he did not consider White to be representing him or Spruce River.

After the transaction was completed, another defendant filed a motion to disqualify Respondent because of the mortgage loan transaction. In response, Respondent prepared an affidavit to be signed by Bergaoui in which Bergaoui would state under oath that he had been advised of the opportunity to seek independent counsel but declined to do so. Only after Bergaoui refused to sign the affidavit did Respondent begin claiming that John White had been independent counsel for Spruce River. Therefore, I find the testimony of Respondent, supported by his law partner White, is not credible regarding White having acted as independent counsel. Their testimony is a *post hoc* effort to recast events in a manner that is more consistent with the requirements of the rules.

I further find, and all parties agree, that no disclosure was made regarding whether Respondent was representing Spruce River in the transaction. In addition, contrary to Respondent's argument, I find that partial compliance is insufficient under the rule.

Report of Referee at 9-11.

Rule 4-1.8(a) governs business transactions with clients. Here, Parrish does not contest that no formal written disclosures pertaining to seeking independent legal counsel or his role in the transaction were provided to Bergaoui. He also does not contest that there was no written client consent with regard to his role in the transaction. Parrish argues that he should not be found guilty of violating this rule because, contrary to the referee's factual findings, White acted as independent counsel for Bergaoui in the transaction, and thus the requirements of the rule were substantially met. However, the referee found otherwise after finding Parrish's and White's testimony not credible on this issue. The referee's determination in this

regard depended largely upon his assessment of the credibility of the witnesses. The Court has repeatedly acknowledged that "[t]he referee is in a unique position to assess the credibility of witnesses, and his judgment regarding credibility should not be overturned absent clear and convincing evidence that his judgment is incorrect." *Fla. Bar v. Tobkin*, 944 So. 2d 219, 224 (Fla. 2006) (quoting *Fla. Bar v. Thomas*, 582 So. 2d 1177, 1178 (Fla. 1991)). We approve the referee's recommendation that Parrish be found guilty of violating Bar Rule 4-1.8(a).

*Bar Rule 4-1.8(e) (Financial Assistance to Client)*

Parrish challenges the referee's recommendation that he be found guilty of violating Bar Rule 4-1.8(e) by loaning money to the defendants to pay the delinquent taxes on the property at issue in the Cotton case. Bar Rule 4-1.8(e) prohibits a lawyer from providing financial assistance to a client in connection with pending or contemplated litigation, except that: (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client. The comment to this provision explains that "[l]awyers may not subsidize lawsuits . . . including making or guaranteeing loans to their clients for living expenses, because to do so would encourage clients to pursue lawsuits that might not otherwise be brought

- 23 -

and because such assistance gives lawyers too great a financial stake in the litigation."

Parrish argues that he did not loan money to his client; rather, he loaned it to the defendants. However, the rule is broader than that, in that it prohibits "financial assistance," which may take many forms. *See Fla. Bar v. Patrick*, 67 So. 3d 1009, 1016 (Fla. 2011) (finding a Bar Rule 4-1.8(e) violation where the attorney paid appellate attorney's fees on behalf of the client). Further, given the comment prohibiting lawyers from "subsidizing" lawsuits, Parrish violated the rule by expending funds on something other than litigation expenses, in order to benefit the client.

*Bar Rule 4-1.8(i) (Acquiring Proprietary Interest in Cause of Action)*

Lastly, Parrish argues that the referee incorrectly concluded that Parrish violated Bar Rule 4-1.8(i) by obtaining a mortgage on several of the parcels at issue in the Cotton case after loaning money to the defendants who owned the parcels. Bar Rule 4-1.8(i) prohibits a lawyer from acquiring "a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) contract with a client for a reasonable contingent fee."

Parrish contends that the mortgage he obtained on the property at issue in the Cotton case does not constitute a violation of this rule because a mortgage is not a proprietary interest. We reject Parrish's narrow reading of Bar Rule 4-1.8(i). Rather, we conclude that the rule is intended to prohibit a lawyer generally from acquiring other types of interests in the subject matter of the litigation; otherwise, the express exceptions for liens and contingency fees would be unnecessary.

*DISCIPLINE*

In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction. *See Fla. Bar v. Anderson*, 538 So. 2d 852, 854 (Fla. 1989); *see also* art. V, § 15, Fla. Const. In addition, the Court views cumulative misconduct more seriously than an isolated instance of misconduct, and cumulative misconduct of a similar nature warrants an even more severe discipline than might dissimilar conduct. *Fla. Bar v. Walkden*, 950 So. 2d 407, 410 (Fla. 2007). In imposing a sanction, the Court considers the following factors: "a) the duty violated; b) the lawyer's mental state; c) the potential or actual injury caused by the lawyer's misconduct; and d) the existence of aggravating and mitigating factors." Fla. Stds. Imposing Law. Sancs. 3.0.

While the Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Standards, *see Florida Bar v. Temmer*, 753 So. 2d 555, 558 (Fla. 1999), we conclude that the Standards and existing case law support more than a one-year suspension.

Here, the most prominent feature of Parrish's misconduct is a conflict of interest. In addition, Parrish violated his duty to his client. Therefore, the most relevant Standards for Imposing Lawyer Sanctions are Standard 4.3 (Failure to Avoid Conflicts of Interest) and Standard 7.0 (Violations of Other Duties Owed as a Professional). We conclude that under these standards, a suspension is the appropriate discipline. *See* Fla. Stds. Imposing Law. Sancs. 4.32 ("Suspension is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."); 7.2 ("Suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.").

Turning to the aggravating and mitigating factors found by the referee, including five aggravating factors—(1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) refusal to recognize wrongful nature of the misconduct; and (5) substantial experience in the practice of law—and one mitigating factor—absence of a prior disciplinary record—we conclude that there

is competent, substantial evidence in the record to support the referee's findings. Moreover, "[a] referee's findings in aggravation carry a presumption of correctness that should be upheld unless clearly erroneous or without support in the record." *Fla. Bar v. Ticktin*, 14 So. 3d 928, 937 (Fla. 2009).

Next, we conclude that there is not a reasonable basis in the case law cited by the referee for his recommendation. The referee relied upon the following cases: *Florida Bar v. Doherty*, 94 So. 3d 443 (Fla. 2012); *Florida Bar v. Patrick*, 67 So. 3d 1009 (Fla. 2011); *Ticktin*, 14 So. 3d 928; *Florida Bar v. Herman*, 8 So. 3d 1100 (Fla. 2009); and *Florida Bar v. Rotstein*, 835 So. 2d 241 (Fla. 2002).

First, while *Doherty* involved a conflict of interest between attorney and client, that decision is distinguishable where we disbarred the attorney who had previously received a two-year suspension. 94 So. 3d at 445.

Next, the following cases, while involving conflicts of interests between the attorney and his client, are not determinative here because Parrish engaged in multiple instances of unethical conduct involving numerous Bar Rule violations, unlike in those cases. In *Patrick*, we imposed a one-year suspension where the attorney violated the rule against advancing costs of litigation to a client by paying a portion of the client's appellate counsel's fees. 67 So. 3d at 1019. A ninety-one-day suspension was imposed in *Ticktin*, where the attorney entered into a business transaction with a client without required disclosures and client consent, although

the client was highly sophisticated and manipulated the attorney into engaging in the transaction. 14 So. 3d at 940. In *Herman*, we imposed an eighteen-month suspension upon an attorney who, without the required disclosures and informed consent of his client, became an investor, and eventually the sole investor, in another competing company. 8 So. 3d at 1108.

Finally, we approved a recommended suspension of one year in *Rotstein*, where the attorney violated numerous Bar Rules by taking positions adverse to his clients. 835 So. 2d at 246-47. *Rotstein*, however, is not controlling because it was decided over fifteen years ago and in more recent years the Court has imposed even more severe discipline for unethical and unprofessional conduct than in the past. *Fla. Bar v. Rosenberg*, 169 So. 3d 1155, 1162 (Fla. 2015).

Accordingly, we conclude that a three-year suspension is warranted by Parrish's misconduct. *See, e.g.*, *Fla. Bar v. Adorno*, 60 So. 3d 1016, 1034-37 (Fla. 2011) (three-year suspension imposed upon attorney based upon a settlement agreement in favor of individual clients to the detriment of class clients, constituting a conflict of interest and an excessive fee); *Fla. Bar v. Scott*, 39 So. 3d 309, 317 (Fla. 2010) (conflicts of interest between lawyer and client and misrepresentations to client warranted three-year suspension).

## CONCLUSION

Accordingly, Respondent, Jon Douglas Parrish, is hereby suspended from the practice of law for three years. The suspension will be effective thirty days from the filing of this opinion so that Parrish can close out his practice and protect the interests of existing clients. If Parrish notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the three-year suspension effective immediately. Parrish shall fully comply with Bar Rule 3-5.1(h). Further, Parrish shall accept no new business from the date this opinion is filed until he is reinstated.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Jon Douglas Parrish in the amount of $7,100.38, for which sum let execution issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS SUSPENSION.

Original Proceeding – The Florida Bar

Joshua E. Doyle, Executive Director, Tallahassee, Florida, Troy Matthew Lovell, Bar Counsel, Tampa, Florida, and Adria E. Quintela, Staff Counsel, The Florida Bar, Sunrise, Florida,

for Complainant

Donald G. Peterson and Jonathan M. Weirich of Parrish, White & Yarnell, P.A., Naples, Florida; and J. Christopher Lombardo, Lenore Brakefield, and Joseph M. Coleman of  Woodward, Pires & Lombardo, P.A., Naples, Florida,

 for Respondent